UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
                                       :
MARK HOLLIDAY, *the Liquidating Trustee of the*   :    MEMORANDUM DECISION
*BosGen Liquidating Trust*,             :         AND ORDER
                                       :
                    Plaintiff-Appellant, :         20 Civ. 5404 (GBD)
                                       :
        -against-                      :
                                       :
CREDIT SUISSE SECURITIES (USA) LLC, et al., :
                                       :
                    Defendants-Appellees. :
------------------------------------- x

GEORGE B. DANIELS, United States District Judge:

Plaintiff-Appellant Mark Holliday, liquidating trustee of the Boston Generating, LLC ("BostonGen") Liquidating Trust, initiated the above-captioned matter before this Court, appealing a dismissal of the Third Amended Complaint ("Complaint") by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). Specifically, Plaintiff-Appellant appeals Judge Robert E. Grossman's (1) June 18, 2020 Memorandum Opinion and (2) June 19, 2020 Order (together, the "June Opinion and Order"), dismissing Plaintiff-Appellant's fraudulent conveyance claims.[1] (Appellant's Br., Appendix ("Appellant's App."), ECF No. 6, A721, A803.) Judge Grossman's dismissal is hereby AFFIRMED.

## I. FACTUAL BACKGROUND

### A. The Leveraged Recapitalization Transaction.

In October 2006, EBG Holdings LLC's ("EBG") board of directors approved a leveraged recapitalization transaction, which consisted of EBG, a holding company with no significant

---

[1] The Bankruptcy Court also dismissed Plaintiff-Appellant's unjust enrichment claim but Plaintiff-Appellant does not appeal that dismissal. (Appellant's Br. at 2 n.7.)

independent business operations, and its main operating entity, Boston Generating, LLC ("BostonGen"), borrowing funds from lenders to, *inter alia*, fund a $925 million tender offer and a $35 million dividend (the "Leveraged Recap Transaction"). (Appellees' App., ECF No. 7-1, AA0005, AA003; Appellants' App. at A165 ¶ 1, A172 ¶ 27, A206 ¶ 117, A209 ¶ 125.) Pursuant to the Leveraged Recap Transaction, EBG redeemed member equity units and warrants and paid a dividend to EBG members (the "Tender Offer"). (Appellant's App. at A165.) Notably, the Tender Offer was conditioned upon EBG and BostonGen's receipt of financing as contemplated by the Leveraged Recap Transaction. (*Id.* at A700, A703.)[2]

## B. The Credit Facilities.

On December 4, 2006, BostonGen presented the Leveraged Recap Transaction to a group of lenders, informing them that BostonGen and EBG "intend[ed] to enter into $2.1 billion of credit facilities in connection with the proposed recapitalization" and that "$1.025 billion will be used to fund 'Unit Buyback Distribution and Warrants Repurchase.'" (Decl. of William H. Gussman, Jr., *In re Boston Generating, LLC, et al.*, AP Case No. 12-01879 (Bankr. S.D.N.Y. Nov. 1, 2013), ECF No. 152-4 ("Lender Presentation"), at 1–2; *see also* Appellant's App. at A729.)[3]

On December 21, 2006, BostonGen entered into two credit facility agreements that required BostonGen to use a portion of the proceeds from each to "fund the Distribution and

---

[2] Plaintiff-Appellant appeals the Bankruptcy Court's determination that EBG and BostonGen were parties to the "Offer to Purchase" dated November 16, 2006, contending that BostonGen was not a party because the Offer to Purchase explicitly states that EBG "is offering to purchase" member units. (Appellant's Br. at 24 (citing Appellant's App., at A681).) Since this Court finds below that BostonGen is a "financial institution" as that term is defined in Section 101(22), regardless of whether BostonGen was a party to the Tender Offer, it need not reach the issue.

[3] "A court may [] take judicial notice of 'relevant matters of public record.'" *In re Trib. Co. Fraudulent Conv. Litig.*, No. 12 Civ. 2652 (DLC), 2019 WL 1771786, at *5 (S.D.N.Y. Apr. 23, 2019) (quoting *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012)).

2

Tender Offer of EBG Holdings." (Appellants' App., at A208 ¶ 122; *id.* at A390 § 2.14(a), A511 § 2.14.) Thereafter, US Bank National Association ("US Bank") acted as "Depositary" for BostonGen in connection with the receipt and disbursement of proceeds from the credit facilities. (*Id.* at A660.) Indeed, in the "Closing Date Funds Flow Memorandum" dated December 21, 2006 that it sent to US Bank (the "FFM"), BostonGen instructed US Bank to, *inter alia*, accept the proceeds from the credit facilities on the closing date and disburse the funds in accordance with the disbursements listed in the FFM. (*Id.*) US Bank, then, "transferred approximately $708 million to fund the unit buyback, warrant redemption and member distribution" and "approximately $50 million [] to pay fees and expenses incurred in connection with the closing of the" credit facilities. (*Id.* at A209 ¶ 124, A664.) Regarding the $708 million transfer, US Bank distributed those funds to EBG's Bank of America ("BofA") account (the "BofA transfer"). (*Id.* at A663–A665.) EBG then caused the funds to be transferred to its BONY account, (the "BONY transfer," but together with the BofA transfer, the "BostonGen Transfer"), for distribution in connection with the "Distribution, Unit Buyback and Warrants Repurchase." (*Id.*)

EBG then entered the "Mezzanine Credit Facility," which similarly required EBG to use a portion of the proceeds to fund its distribution and Tender Offer. (*Id.* ¶ 123; Appellant's App. at A620 § 2.13.) On December 26, and December 28, 2006, EBG disbursed these proceeds, together with the BostonGen Tranfer, as follows: to pay "dividends on EBG's members' equity interests" (the "$35 Million Distribution"), "to redeem EBG's members' equity units," and to pay "for the redemption of warrants." (*Id.* at A209 ¶ 125.)

3

## C. The Bankruptcy Proceedings.

On August 18, 2010, Debtors[4] filed a "[v]oluntary [p]etition for relief under Chapter 11 of Title 11 of the United States Code" in the Bankruptcy Court. (*Id.* at A165 ¶ 1 n.1, A181–A182 ¶ 59.) On August 31, 2011, the Bankruptcy Court confirmed the "Final Cumulative Joint Plan of Liquidation of Boston Generating, LLC et al." (the "Plan"), which created a liquidating trust and appointed a liquidating trustee. (*Id.* at A165 ¶ 1 n.1, A181–A182 ¶ 59.) Plaintiff-Appellant alleges that the liquidating trustee is the assignee of the "Class 4B claim holders" unsecured claims related to the Leveraged Recap Transaction. (*Id.* at A737; *see also id.* A167 ¶ 4, A181–A182 ¶ 59–60.) "The claims and causes of action of such creditors are Liquidating Trust Assets...." (*Id.* at A182–A183 ¶ 61.)

On August 17, 2012, the first liquidating trustee filed an adversary proceeding in the Bankruptcy Court. (*Id.* at A19.) On August 1, 2013, Mark Holliday, successor liquidating trustee, filed an amended complaint. (*Id.* at A28, A181–A182 ¶ 59.) On January 10, 2014, the Trustee sought leave to file a second amended complaint which the Bankruptcy Court denied. (*Id.* at A36–A37.) On April 3, 2019, the Trustee sought leave to file a third amended complaint and, after Defendants-Appellees consented, the Bankruptcy Court granted Plaintiff-Appellant's motion on April 24, 2019. (*Id.* at A46.) Defendants-Appellees moved to dismiss the Complaint. After hearing oral argument twice, the Bankruptcy Court entered the June Opinion and Order, dismissing the Complaint. (*Id.* at A801–A802.)

Particularly relevant to the present appeal, the Bankruptcy Court (i) dismissed Plaintiff-Appellant's state law fraudulent conveyance claims (counts one to four of the Complaint),

---

[4] The Debtors are BostonGen, EBG, Fore River Development, LLC, Mystic I, LLC, Mystic Development, LLC, BG New England Power Services, Inc., and BG Boston Services, LLC. (Appellant's App. at A165 n.1.)

4

concluding that the BostonGen Transfer and the $35 Million Distribution are safe harbored by Section 546(e), and (ii) concluded that Section 546(e) preempts those claims. (*Id.*) Plaintiff-Appellant timely filed an appeal on July 14, 2020. (Notice of Appeal, ECF No. 1.)

## II. LEGAL STANDARD

### A. Review of Bankruptcy Court Orders.

This Court has jurisdiction over appeals from bankruptcy court judgments, orders or decrees pursuant to 28 U.S.C. § 158(a). This Court reviews a bankruptcy court's findings of law *de novo* and its findings of fact for clear error. *See In re AMR Corp.*, 764 F. App'x 88, 89 (2d Cir. 2019); *In re Vebeliunas*, 332 F.3d 85, 90 (2d Cir. 2003). In reviewing the bankruptcy court's determinations, this Court may rely upon any ground supported by the record—it need not rely solely upon those relied upon by the Bankruptcy Court. *See Krakowski v. Am. Airlines, Inc.*, 610 B.R. 714, 720 (S.D.N.Y. 2019); *Freeman v. Journal Register Co.*, 452 B.R. 367, 369 (S.D.N.Y. 2010).

## III. THE BOSTONGEN TRANSFER IMPLICATES THE SECTION 564(e) SAFE HARBOR

### A. The Relevant Transfer.

Plaintiff-Appellant contends that the BofA transfer is the relevant transfer because that is the transfer he seeks to avoid in Counts II and IV of the Complaint. (Appellant's Br. at 20; Appellant's App. at A233 ¶ 164, A228 ¶ 186.) He further argues that the Bankruptcy Court misapplied *Merit* and, instead of "analyzing the transfer as pleaded," the court concluded that the relevant transfer included the BONY transfer. (Appellant's Br., at 21–22 (citing Appellant's App., at A733–34).) Defendants-Appellees, on the other hand, contend that the "'overarching transfer'

was the payment by the Debtors of nearly $1 billion . . . to their shareholders in satisfaction of their equity interests." (Appellees' Br., at 25.)

The analysis must begin with the Supreme Court's holding in *Merit*. There, the Court addressed "how the [§ 546(e)] safe harbor operates in the context of a transfer that was executed via one or more transactions." *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 888 (2018). Specifically, to accomplish a stock acquisition, the acquiring entity caused its lender to wire the purchase price to a third-party escrow agent, who then disbursed payment to the target entity's shareholders and in exchange collected their stock certificates. *Id.* at 891. The Court held that "the relevant transfer for purposes of the § 546(e) safe-harbor inquiry is the overarching transfer that the trustee seeks to avoid"—the "end-to-end" transfer from the acquiring entity to the defendant-shareholder—as opposed to "any component part of that transfer"—the transfer between the intermediaries. *Merit*, 138 S. Ct. at 893. Thus, in the present case, this Court must determine what is the relevant transfer for the § 546(e) safe harbor inquiry in accordance with *Merit's* holding.

Contrary to Plaintiff-Appellant's contention, *Merit* does not support the proposition that a court must analyze a transfer divorced from its context. While *Merit* does instruct that the relevant transfer is the one "that the trustee seeks to avoid," a court need not rely on a trustee's definition of the relevant transfer if that definition is challenged. (*Id.*) Indeed, *Merit* instructs that "the trustee is not free to define the transfer that it seeks to avoid in any way it chooses." *Merit*, 138 S. Ct. at 894. A court must instead refer to "the substantive avoiding power" which provides guidance for determining the relevant transfer. As *Merit* explains, the relevant transfer is the one "that the trustee seeks to avoid as an exercise of" the substantive avoiding power. *Id.* at 893. Here, Plaintiff-

6

Appellant pursues New York fraudulent conveyance claims. Thus, the relevant transfer is defined by reference to New York law. (Appellant's App. at A216–A228.)

"'[A]n allegedly fraudulent conveyance must be evaluated in context; '[w]here a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications.'" *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) (citations omitted). At the heart of this case is the Leveraged Recap Transaction, the purpose of which was to complete a unit buyback, warrant redemption and member distribution. (Appellant's App. at A165 ¶ 1.) The BostonGen Transfer was an integral transfer in the Leveraged Recap Transaction. (Appellant's App. at A209 ¶¶ 124-25, A220 ¶¶ 159–60, A226 ¶ 178.) Plaintiff-Appellant, however, challenges the BostonGen Transfer in a piecemeal fashion by seeking to avoid one component, the BofA Transfer, but the context of the Leveraged Recap Transaction cannot be ignored. That context informs that the overarching transfer that Plaintiff-Appellant seeks to avoid is the BostonGen Transfer.

Indeed, all the parties to the Leveraged Recap Transaction, including the lenders for the first and second credit facilities, knew that BostonGen would transfer a portion of its loan proceeds to achieve the goal of the Leveraged Recap Transaction, funding the Tender Offer. (*See, e.g.*, Appellant's App., at A390 § 2.14, A511 § 2.14, A620 § 2.13; Lender Presentation at 1.) Plaintiff-Appellant would have this Court ignore these facts and, instead, analyze the BofA transfer in a vacuum.[5] Such an approach, however, would permit a trustee to circumvent the safe harbor by

---

[5] Plaintiff-Appellant contends that viewing the transfer as part of an integrated transaction would deprive the BostonGen creditors of their rights because the harm to them occurred when BostonGen transferred the funds as opposed to using it to pay its debt. (Appellant's Reply at 7.) Yet, Plaintiff-Appellant's own allegations in the Complaint, demonstrate that the harm complained of is BostonGen's use of the $708 million in accordance with the overall plan for the Leveraged Recap Transaction and the terms of BostonGen's credit facility agreements; to fund the Tender Offer. Moreover, this Court need not hypothesize how the Section 546(e) inquiry would change had EBG used the funds for purposes other than the tender offer. (*Id.* at 8.)

7

carving up an integrated securities transaction consisting of multiple component parts. That would unnecessarily restrict the safe harbor and "seriously undermine ... markets in which certainty, speed, finality, and stability are necessary to attract capital." *In re Tribune Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 90 (2d Cir. 2019), *cert. dismissed in part sub nom. Deutsche Bank Tr. Co. v. Robert R. McCormick Found.*, 141 S. Ct. 728 (2020), and *cert. denied sub nom. Deutsche Bank Tr. Co. Americas v. Robert R. McCormick Found.*, No. 20-8, 2021 WL 1521009 (Apr. 19, 2021). Accordingly, the overarching transfer challenged here is the BostonGen Transfer.[6] Any safe harbor inquiry that focuses on a component part of that transfer would be contrary to the holding in *Merit*, which instructs that the relevant transfer is not limited to "any component part." *Merit*, 138 S. Ct. at 893.

## B. The BostonGen Transfer is a Settlement Payment.

The BostonGen transfer is a settlement payment protected by the safe harbor. "[T]he trustee may not avoid a transfer that is a ... settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a ... financial institution. ..." 11 U.S.C.A. § 546. A "settlement payment" means "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8). A "settlement payment" is a "transfer of cash or securities made to complete [a] securities transaction." *Enron Creditors Recovery v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334–35 (2d Cir. 2011). As the Bankruptcy Court correctly determined, the BostonGen Transfer was a transfer of

---

[6] The Bankruptcy Court concluded that the overarching transfer was the transfer from BostonGen to BONY. (Appellant's App. at A792–94; *see also id.* at A733–34.) Even if this Court were to adopt this more limited transfer, Plaintiff-Appellant's claims would still be precluded by Section 546(e)'s safe harbor.

8

cash made to complete a securities transaction—specifically, the Tender Offer. (*See e.g.*, Appellant's App. at A209 ¶¶ 124–25.)

Plaintiff-Appellant contends, however, that the BostonGen Transfer is a simple dividend and not a settlement payment because BostonGen "must have given some value in exchange for a security." (Appellant's Br. at 46; Reply at 9.) He further argues that the inquiry does not consider EBG's intent or what it did with the $708 million but considers whether the BofA transfer "was, itself a settlement payment." (*Id.* at 47 (citing *Merit*, 138 S. Ct. at 894).) At bottom, these arguments pertain to Plaintiff-Appellant's request that this Court ignore the context of the BofA transfer. That request is denied for the reasons set forth above. The factual allegations of the Complaint demonstrate that the BostonGen Transfer was not "a simple dividend" but a "transfer of cash [] made to complete [a] securities transaction." *Enron*, 651 F.3d at 334–35. Irrespective of EBG's intent[7] and facts not before this Court, the Complaint makes clear that the Leveraged Recap Transaction entailed BostonGen and EBG borrowing funds to complete a Tender Offer. BostonGen did in fact borrow funds and distributed $708 million in accordance with the terms of the Leveraged Recap Transaction and its credit facility agreements. The BostonGen Transfer meets the definition of a settlement payment. Accordingly, the Section 546(e) safe harbor for settlement payments applies.

## C. The BostonGen Transfer was Made in Connection with a Securities Contract.

A "trustee may not avoid a transfer that is . . . a transfer made by or to (or for the benefit of) a . . . financial institution . . . in connection with a securities contract, as defined in section 741(7), . . ." 11 U.S.C.A. § 546. Section 741(7) defines a "securities contract" expansively to

---

[7] Nevertheless, contrary to Plaintiff-Appellant's contention, a court is not precluded from considering intent. *See In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 422 (2d Cir. 2014) (finding that payments were settlement payments even though there was no actual securities trading because customers *intended* for debtor to dispose of securities and remit payment).

include "a contract for the purchase [or] sale [] of a security, . . . including any repurchase . . . transaction on any such security," 11 U.S.C.A. § 741(7)(A)(i), and "any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph." 11 U.S.C. § 741(7)(A)(vii); *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 418 (2d Cir. 2014) ("[T]he term 'securities contract' expansively includes . . . any agreements that are *similar* or *related* to contracts for the purchase or sale of securities."). "This concept is broadened even farther because § 546(e) also protects a transfer that is 'in connection' with a securities contract." *Madoff*, 773 F.3d at 418. "[A] transfer is 'in connection with' a securities contract if it is 'related to' or 'associated with' the securities contract." *Id.* at 421 (citations omitted). Certainly, borrowing and, subsequently, distributing loan proceeds to fund a Tender Offer is a transfer that is "associated with" or "related to" a securities contract. Accordingly, the Bankruptcy Court did not err when it concluded that the BostonGen Transfer was made in connection with the Tender Offer. (Appellant's App. at A784–85.)

Plaintiff-Appellant does not seem to dispute that the transfer meets the definition outlined in *Madoff* but, instead, argues that the Second Circuit's definition "provides no guidance" and requires a "limiting principle." (Appellant's Br. at 49–50 (citing *Maracich v. Spears*, 570 U.S. 48, 60 (2013).) He contends that "in connection with a securities contract" should only include those "transfers made by a debtor that was purchasing, selling, or otherwise transacting in securities." Even if this Court were to adopt this limiting principle, it is not entirely clear how Plaintiff-Appellant could argue that BostonGen does not meet the requirement whereas here it is a customer of a financial institution, US Bank, who "transact[ed] in securities," funding the Tender Offer.

Plaintiff-Appellant also contends that "Congress was concerned about protecting financial institutions or customers of financial institutions that had entered into a securities contract or

10

related agreements." (Appellant's Br. at 53–54.) To the extent Plaintiff-Appellant argues that the limiting principle should be a requirement that financial institutions and customers be parties to a securities contract or agreement to be safe harbored, such a limitation finds no support in Section 546(e)'s text. It is, therefore, rejected. Plaintiff-Appellant relies on the definitions of "forward contract merchant," "financial participant," "swap participant" and "repo participant," arguing that the definitions demonstrate congressional intent to define "financial institution" to exclusively cover a party to a securities contract.[8] (Appellant's Br. at 53.) This argument is unavailing. Indeed, the definitions relied upon further dispel any argument that Congress intended to impose Plaintiff-Appellant's proposed limitation. If Congress intended to restrict the Section 546(e) safe harbor to only protect parties to a securities contract, "it clearly knew how (yet declined) to do so." *In re Trib.*, 946 F.3d at 79 n.10; *compare* 11 U.S.C. §§ 101(22A) ("financial participant" means an "entity that, . . . *has . . . agreements or transactions*" with a debtor or defined entity) (emphasis added), 101(26) (defining "forward contract merchant," not as a party to any particular contract, but as an entity *in the business of entering into* forward contracts) (emphasis added), 101(46) ("repo participant" means an entity that "*has a [] repurchase agreement with* the debtor") (emphasis added), 101(53C) ("swap participant" defined as an entity that "*has a[] swap agreement with* the debtor") (emphasis added), *with* 101(22) (defining "financial institution" as a "commercial or savings bank" or its customer, when such bank acts as the customer's "agent or custodian . . . *in connection with* a securities contract") (emphasis added).

Likewise, Plaintiff-Appellant's reliance on Sections 555, 546(f) and (g) is similarly unavailing. As with the definitions above, those sections (or the defined terms therein) expressly

---

[8] While this contention appears to pertain to Plaintiff-Appellant's arguments regarding a proposed limit to the term "financial institution," discussed below, as opposed to the phrase "in connection with," this Court will address it here since Plaintiff-Appellant raises it here.

11

reference an agreement or contract. The absence of similar text in Section 546(e) and the definition of "financial institution" leads to the conclusion that Congress did not intend to impose such a requirement. As the Second Circuit concluded, Congress intended for "in connection with a securities contract" to be interpreted expansively. *Madoff*, 773 F.3d at 418. Consequently, this Court rejects Plaintiff-Appellant's proposed limit to the definition of "in connection with." To be sure, this case is not one where the transfer has just "any tangential connection to" a securities contract. (Appellant's Br. at 52.) BostonGen made the BostonGen Transfer for the very purpose of funding the Tender Offer.

Accordingly, the Bankruptcy Court correctly determined that the BostonGen Transfer is protected as a transfer made in connection with a securities contract.

### D. BostonGen is a Covered Entity.

Plaintiff-Appellant contends that the Bankruptcy Court erred when it concluded that BostonGen is financial institution "[b]ecause no bank acted as an agent or custodian to" BostonGen "in connection with" the BostonGen Transfer. (Appellant's Br. at 31–32.) Defendants-Appellees do not provide much on this point regarding BostonGen, except a citation to the Bankruptcy Court's opinion. (Appellees' Br. at 33.)

BostonGen is a financial institution within the meaning of Section 101(22). A trustee may not avoid "a transfer made by or to (or for the benefit of) a ... financial institution, ... in connection with a securities contract, as defined in section 741(7)...." 11 U.S.C. § 546(e). "Section 101(22) of the Code defines 'financial institution,' to include, *inter alia*, 'an entity that is a commercial or savings bank, ... trust company, ... and, when any such ... entity is acting as agent or custodian for a customer (whether or not a 'customer', as defined in section 741) in connection with a securities contract (as defined in section 741) such customer.'" *In re Trib.*, 946 F.3d at 78 (citing 11 U.S.C. § 101(22)(A)). Thus, BostonGen qualifies as a financial institution if

it is a customer of a bank or trust company that acted as BostonGen's agent in connection with a securities contract. BostonGen meets this definition.

First, U.S. Bank is a financial institution for purposes of Section 546(e)'s safe harbor because it is a bank and trust company. Office of the Comptroller of the Currency, Trust Banks Active as of June 30, 2021, at https://www.occ.treas.gov/topics/charters-and-licensing/financial-institution-lists/trust-by-name.pdf; Office of the Comptroller of the Currency, National Banks & Federal Branches and Agencies Active as of June 30, 2021, htttps://www.occ.treas.gov/topics/charters-and-licensing/financial-institution-lists/national-by-name.pdf.

Second, BostonGen was U.S. Bank's customer in connection with the Tender Offer. The term "customer" referenced in the definition of "financial institution" is "defined as 'someone who buys goods or services' or 'a person . . . for whom a bank has agreed to collect items.'" *Tribune*, 946 F.3d at 78–79 (quoting *UBS Fin. Servs., Inc. v. W. Virginia Univ. Hosps., Inc.*, 660 F.3d 643, 650 (2d Cir. 2011); Black's Law Dictionary (10th ed. 2014)). It "is not limited to the specialized definition in Section 741." *In re Trib.*, 946 F.3d at 78–79. In *Tribune*, the Second Circuit found that the entity there was a customer because it bought the bank's services by retaining it to "act as Depositary" and, in return, the bank agreed to collect the purchase price and tendered shares, and pay the tendering shareholders. *Tribune*, 946 F.3d at 79. Here, BostonGen retained US Bank as Depositary and, in return, US Bank agreed to collect deposits and "make such allocations, transfers, and payments in accordance with the" funds flow memorandum. (Appellant's App. at A660–61.) Specifically, BostonGen instructed US Bank to disburse proceeds to fund the Tender Offer. Accordingly, as the Second Circuit found in *Tribune*, BostonGen is a customer under Section 101(22).

Third, US Bank was BostonGen's agent. "'[A]gency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.'" *In re Trib.*, 946 F.3d at 79 (citations omitted). Generally, "[w]hether an agency relationship exists is a mixed question of law and fact." *Trib.*, 946 F.3d at 79. "However, the existence of an agency relationship can be resolved 'as a matter of law' if: '(1) the facts are undisputed; or (2) there is but one way for a reasonable jury to interpret them.'" *In re Trib.*, 946 F.3d at 79. Here, BostonGen manifested its assent to US Bank's agency by authorizing the bank to receive funds from the lenders and entrusting it to make the necessary distribution in connection with the Tender Offer. (Appellant's App. at A660–61; *see also id.* at AA664–65 (evidencing the flow of funds distributed by US Bank for distribution in connection with the Tender Offer). U.S. Bank manifested its acceptance of the agency relationship by receiving and distributing the funds in connection with the Tender Offer as BostonGen instructed. Finally, BostonGen maintained control over key aspects of the undertaking. (*Id.* at A660–61.) Thus, an agency relationship existed between BostonGen and US Bank.

Plaintiff-Appellant, however, argues that BostonGen is not a covered entity because "in connection with" must be interpreted such that a customer is a financial institution only when a bank "make[s] or receive[s] the relevant transfer on behalf of the customer." (Appellant's Br. at 34.) Even if this Court were to adopt Plaintiff-Appellant's proposed interpretation, BostonGen would satisfy it. US Bank made the relevant transfer of $708 million on behalf of BostonGen, as instructed, in order to fund the Tender Offer. Yet, Plaintiff-Appellant doubles down and argues that if BostonGen is a financial institution, it "effectively" signifies that "having any relationship to a securities contract is sufficient to bring a customer within the definition." (Appellant's Br. at

14

36.) This is not so. Plaintiff-Appellant's argument, again, focuses on the BofA Transfer and ignores its context. The relevant transfer, however, is the BostonGen Transfer. Pursuant to the Recap Transaction, the very purpose of which was to fund the unit buyback, warrant redemption and member distribution, BostonGen made the BostonGen Transfer for disbursement to EBG's members. Contrary to Plaintiff-Appellant's contention, this case is one in which the relevant transfer is directly related to or associated with the securities contract. The very type of transfer that Congress intended to protect under Section 546(e).

Lastly, Plaintiff-Appellant's contention that US Bank must be "identified in the Tender Offer as an agent" and that the transfer must "satisfy an[] obligation [BostonGen] had under the Tender Offer" is rejected. (Appellant's Br. at 37.) There is no requirement that a financial institution be identified in a securities contract for it to serve as agent of a customer. As the Second Circuit explained, the test for agency is informed by common law. US Bank meets that test here irrespective of whether it is identified in the Tender Offer. Additionally, the BostonGen Transfer was made to meet the funding requirements of the Tender Offer. Indeed, regardless of whether BostonGen was a party to the Tender Offer, the Tender Offer was conditioned on the receipt of funds from the three credit facilities—BostonGen entered two of the three credit facilities. (Appellant's App. at A700, A703.) BostonGen satisfied its obligations pursuant to the Leveraged Recap Transaction.

Accordingly, BostonGen is a qualifying entity entitled to the protection of the Section 546(e) safe harbor.[9]

---

[9] Since this Court finds that BostonGen is a protected entity under Section 546(e) because U.S. Bank acted as agent for BostonGen in connection with the Tender Offer, it need not address the issue of whether BONY is also an agent of BostonGen.

## IV. THE $35 MILLION DIVIDEND IMPLICATES THE SECTION 564(e) SAFE HARBOR

Plaintiff-Appellant appeals the Bankruptcy Court's holding that the $35 Million Distribution was a protected transfer. (Appellant's Br. at 56.) He argues that the transfer was not "made in connection with the Tender Offer" because EBG made the transfer prior to its purchase of any member units and paid the distribution to all members, regardless of whether they tendered any units. (Appellant's Br. at 56; Reply at 22–23.) Thus, he argues, because it is not a qualifying payment, "no bank acted as EBG's agent or custodian" in connection with this transfer. (*Id.* at 57.) Conversely, Defendants-Appellees contend the distribution is a protected transfer because it was integral to the Tender Offer. (Appellees' Br. at 37.) They contend that it was paid "in anticipation" of the purchase in order to "return value" to EBG's equity members and enhance benefits relating to tax liability and planning under the Recap Transaction. (*Id.*)

The Bankruptcy Court did not err when it concluded that the $35 Million Distribution was (i) a settlement payment and (ii) a payment made "in connection with" the Tender Offer. (Appellant's App. at A796–97.) The statutory text makes clear that a transfer is protected if it is made to complete a securities transaction or made in relation to or in association with a securities contract. *Enron*, 651 F.3d at 334–35; *Madoff*, 773 F.3d at 421 (citations omitted). As the Bankruptcy Court properly concluded, the $35 Million Distribution was a transfer of cash made to complete the Tender Offer pursuant to the Leveraged Recap Transaction. (Appellant's App. at A165 ¶ 1.) Accordingly, it was a settlement payment. Likewise, the transfer was directly related to and associated with the Tender Offer. The Tender Offer contemplated a $35 Million Distribution, "prior to the purchase of [u]nits," in order to "return value to Members in a manner consistent with the [Leveraged Recap Transaction]." (Appellant's App. at A708.) Therefore, the

16

distribution also meets, if not exceeds, the "low bar" set by Congress and is a transfer made "in connection with" the Tender Offer.

Contrary to Plaintiff's contention, that the distribution occurred prior to the purchase of units or was a dividend to all members, is of no import. Indeed, Section 546(e) "does not distinguish between kinds of transfers . . . [s]o long as the transfer sought to be avoided is within the language" of the safe harbor. *In re Trib.*, 946 F.3d at 84. Accordingly, the $35 Million Distribution is within the language of the safe harbor.

Since Plaintiff-Appellant's remaining challenges depend upon its rejected argument above, those challenges are similarly rejected.[10]

## V. PLAINTIFF-APPELLANT'S STATE LAW FRAUDULENT CONVEYANCE CLAIMS ARE PREEMPTED

The Bankruptcy Court properly concluded that Section 546(e) preempts Plaintiff-Appellant's state law fraudulent conveyance claims. (Appellant's App. at A770–A775.) As an initial matter, "it is axiomatic that a district court cannot simply take a position contrary to that of its circuit court and regard the circuit court's interpretation of a given statute as not binding." *In re Quebecor World (USA) Inc.*, 480 B.R. 468, 477 (S.D.N.Y. 2012), *aff'd*, 719 F.3d 94 (2d Cir. 2013) (quoting *United States v. Russotti*, 780 F. Supp. 128, 131 (S.D.N.Y.1991)). Accordingly, *Tribune* is binding, and Plaintiff-Appellant's constructive fraudulent conveyance claims are preempted and, thereby, dismissed.

Regarding the creditors' intentional fraudulent conveyance claims, Plaintiff-Appellant contends that there is no "evidence in the text and structure of § 546(e) that Congress intended to

---

[10] To the extent Plaintiff-Appellant argues that Section 546(e) is only applicable where the transfer is between parties to a securities contract, that argument finds no support in the text, as discussed *supra* III.C. Accordingly, it is rejected.

preempt state-law claims to recover transfers made with [] actual intent...." (Appellant's Br. at 58–59.) Plaintiff-Appellant's intentional fraudulent conveyance claims, however, are preempted. Contrary to his contention, *Tribune's* holding extends to intentional fraudulent conveyance claims.[11] As the Second Circuit explained, "'Congress intended the Bankruptcy Code to create a whole scheme under federal control that would adjust all of the rights and duties of debtors and creditors alike....'" *In re Trib.*, 946 F.3d at 82 (citing *In re Miles*, 430 F.3d 1083, 1091 (9th Cir. 2005)). Thus, once the Debtors entered bankruptcy, the "creditors' avoidance claims," both constructive and intentional, "vested in the" trustee under Section 544(b)(1). *In re Trib.*, 946 F.3d at 82–83; *see also id.* at 84 (Section 544 "allows the bankruptcy trustee to step into the shoes of a creditor for the purpose of asserting causes of action under state fraudulent conveyance acts for the benefit of all creditors") (quoting *In re Mortgage America Corp.*, 714 F.2d 1266, 1275-76 (5th Cir. 1983)); 11 U.S.C. § 544(b)(1) ("the trustee may avoid any transfer ... that is voidable under applicable law by a creditor holding an unsecured claim").

The Section 544 avoiding power is limited by Section 546(e)'s safe harbor, which bars the avoidance of a transfer that is a "settlement payment" or made "in connection with a securities contract, [] except under section 548(a)(1)(A) [] ." 11 U.S.C. § 546(e). By its plain language, a trustee may not exercise the vested state law intentional and constructive fraudulent conveyance claims to avoid a transfer within the scope of Section 546(e). Permitting the creditors here to pursue claims barred by Section 546(e) would fly in the face of Congress's intent to limit the disruption to the securities market. Section 546(e) bars a creditors' state law intentional fraudulent conveyance claim.

---

[11] Plaintiff-Appellant contends that *Tribune* is distinguishable "because two of the transfers at issue here are outside the scope of the § 546(e) safe harbor...." (Appellant's Br. at 58.) As discussed above, however, the transfers at issue in this case are within the scope of the safe harbor.

Plaintiff-Appellant, nevertheless, contends that Section 546(e)'s exclusion of Section 548(a)(1)(A) claims "evidences a congressional belief that the policy reasons underlying the safe harbors did not extend to cases of actual fraud." (Appellant's Br. at 59.) Thus, he argues, because a § 548(a)(1)(A) claim "is nearly identical to a" DCL § 276 claim, "there is no clearly articulated congressional purpose or objective that would preempt the Trust's claims under DCL § 276." (Appellant's Br. at 59–60.) This contention is rejected for several reasons. First, there is no support in the text or legislative history to support Plaintiff-Appellant's position. Second, "Section 548(a)[(1)(A)] . . . provides the trustee [] with [an] *independent* federal intentional [] fraudulent conveyance claim[]." *In re Trib.*, 946 F.3d at 83 (emphasis added). It does not follow that because Congress excepted one, it excepted another. Indeed, as the Bankruptcy Court stated, Congress did not draft the Section 548 exception with New York state's fraudulent conveyance law, or any other state's law, in mind. Third, contrary to Plaintiff-Appellant's contention, reading the exception such that it includes a state law intentional fraudulent conveyance claim would undermine the congressional purpose and objective of Section 546(e).

Assuming for purposes of argument that Plaintiff-Appellant's position prevails, securities market participants will not only be subject to liability for federal intentional fraudulent conveyance claims but for state intentional fraudulent conveyance claims as well. Undoubtedly, such piecemeal litigation undermines the purposes of Section 546(e). *In re Trib.*, 946 F.3d at 87. As the Bankruptcy Court explained, this would create "instability in the securities markets." (Appellant's App. at A774.) Such a result irreconcilably conflicts with Congress's intent that market participants have certainty, finality, and predictability in the securities market, all of which are necessary to attract capital. *In re Trib.*, 946 F.3d at 90 (citing H.R. Rep. No. 97-420 (1982); H.R. Rep. No. 95-595 (1977)). That stability is further undermined if the market participant is

subject to state law intentional fraudulent conveyance claims after the statute of limitations expires for a Section 548 claim.

Section 546(e)'s "purpose is to protect a national, heavily regulated market by limiting creditors' rights." *In re Trib.*, 946 F.3d at 94. Even Section 544's purpose is to "simplify proceedings," and "assure the equitable distribution among the creditors." *Id.* at 86. Reading into Section 546(e)'s language an exception for state intentional fraudulent conveyance claims conflicts with those purposes. Thus, the text controls and Congress's decision to only provide an exception for a claim under Section 548(a)(1)(A) from Section 546(e) stands.

Accordingly, because "[u]nder the Supremacy Clause, Article VI, Clause 2 of the Constitution, federal law prevails when it conflicts with state law, Plaintiff-Appellant's state law, intentional fraudulent conveyance claims are preempted and, thus, dismissed. *In re Trib.*, 946 F.3d at 81 (citing *Arizona v. United States*, 567 U.S. 387 (2012)).[12]

## VI. CONCLUSION

Judge Grossman's June Opinion and Order are AFFIRMED. The Clerk of Court is hereby directed to close the above-captioned bankruptcy appeal.

Dated: New York, New York
      September 10, 2021

SO ORDERED.

*George B. Daniels*
GEORGE B. DANIELS
United States District Judge

---

[12] Since this Court affirms the Bankruptcy Court's dismissal of counts one through four of the Complaint pursuant to Section 546(e) of the Bankruptcy Code, it need not address Defendants-Appellees' alternative grounds for affirmance. (Appellees Br. at 41–54.)